RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0032p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 07-5600/5608

JEFFORY C. YOUNG (07-5600), MORRIS
ROLLER (07-5608),

*Defendants-Appellants.*

_____

Appeal from the United States District Courts
for the Eastern District of Tennessee
at Winchester and Chattanooga.
No. 06-00014—R. Allan Edgar, District Judge.

Argued: December 5, 2008

Decided and Filed: January 30, 2009

Before: MERRITT, MOORE, and COLE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, Gerald
H. Summers, SUMMERS & WYATT, Chattanooga, Tennessee, for Appellants. Perry H.
Piper, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for
Appellee. **ON BRIEF:** Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville,
Tennessee, Gerald H. Summers, Marya L. Schalk, SUMMERS & WYATT, Chattanooga,
Tennessee, for Appellants. Perry H. Piper, ASSISTANT UNITED STATES ATTORNEY,
Chattanooga, Tennessee, for Appellee.

MOORE, J., delivered the opinion of the court, in which COLE, J., joined.
MERRITT, J. (p. 29), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  In 2006, the government named Morris Roller ("Roller") and Jeffory Young ("Young") as defendants in a twenty-count superseding indictment.  Count one charged both men with a conspiracy to manufacture 1000 or more marijuana plants and to distribute 1000 or more kilograms of marijuana.  Roller and Young were tried jointly, and the jury convicted each man of conspiracy involving more than 100 but less than 1000 marijuana plants and more than 100 but less than 1000 kilograms of marijuana.  Roller and Young were also convicted of the substantive offenses with which they were charged.  The district court sentenced Roller to serve 200 months and Young to serve 224 months of imprisonment.  Roller and Young appeal their convictions and their sentences.

On appeal, Roller and Young allege that:  (1) the district court erroneously admitted hearsay; (2) the district court erred when it applied a leadership-role sentencing enhancement; (3) the district court erred in considering acquitted conduct in sentencing; and (4) their sentences were procedurally and substantively unreasonable.  Young also argues that the district court erred when it admitted statements by Roller regarding the use of force to collect drug-related debts.  Roller asserts that the district court's response to the jury's question regarding the duration of the conspiracy was prejudicial error.  We **AFFIRM** Roller's and Young's convictions and sentences.

## I.  BACKGROUND[1]

After an investigation involving confidential informants, wiretaps, and surveillance, Roller and Young were arrested for various crimes relating to marijuana growing and distribution.  Based on this investigation, Roller and Young were indicted by a grand jury in 2006.  A few months later, the government filed a superseding twenty-

---

[1]This section contains a general summary of the testimony and evidence presented at trial; specific statements and information will be addressed in the analysis section where relevant.

count indictment. The first count charged both men with a conspiracy to manufacture 1000 or more marijuana plants and to distribute 1000 or more kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The indictment charged Roller with thirteen additional counts and Young with six. Each of these substantive charges alleged distribution of marijuana or the use of a telephone to facilitate the delivery of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). Roller and Young's joint trial began on January 29, 2007.

In its opening argument, the government contended that Roller and Young were involved in a large-scale, long-term conspiracy to grow, import, and distribute marijuana. Roller and Young admitted that they had sold marijuana, but contended that they had done so on a small scale and that they were not involved in the vast conspiracy described by the government. During the course of the trial, the government called fourteen witnesses.

The government began its case by calling Mark Delaney ("Delaney"), a special agent with the Tennessee Bureau of Investigation who was assigned to investigate Roller and Young. Delaney's testimony largely concerned the mechanics of the audio surveillance that investigators used in this case.

The government next called one of its key witnesses, a confidential informant, Julia Foutch ("Foutch"). At the time that she testified, Foutch was on probation for a felony conviction for reckless endangerment of a child and for manufacturing methamphetamine. Foutch acted as an informant in the hopes of helping her husband who was in prison for manufacturing methamphetamine. Most of Foutch's testimony concerned her recorded interactions with Roller. Per instructions from investigators, Foutch periodically purchased a pound of marijuana from Roller. Over the course of two years, Foutch bought about sixteen pounds of marijuana from Roller. The majority of Foutch's conversations with Roller were recorded, and many of these recordings were played for the jury while Foutch was on the stand. After the jury listened, Foutch would explain the meaning of the recorded conversations.

Foutch testified that Roller and Young asked her to collect outstanding debts from Connie Holt ("Holt"), Kenny Stewart ("Stewart"), and Jimmy White ("White"), individuals who owed Roller and Young money for previous marijuana purchases. Foutch's attempts to collect money from these individuals were recorded, and recordings of her conversations with them were admitted.[2] Foutch asserted that when she went to collect money from Holt, Holt hit her in the head. Foutch testified that, as a result of this assault, Roller and Young sent others to collect Holt's debt and that these individuals kept Holt locked in her bedroom for three days.

In addition, Foutch testified that she agreed to try to obtain methamphetamine for Roller, that Roller sometimes made romantic advances towards her, and that she tried to accept Roller's offer to pay her $10,000 to drive to Dallas to pick up a load of marijuana. Importantly, Foutch also testified that at her first meeting with Roller, he told her that he had lost a truckload of marijuana at Judge Purser Hill Lane when the government intercepted it. This conversation was not recorded.

After Foutch's lengthy testimony, Greg Byford took the stand. At the time of his testimony, Byford was in jail serving a four-year sentence for his second methamphetamine-related felony conviction. The government granted Byford use immunity. Byford testified that between 1996 and 1999 he helped Roller and Young prepare marijuana for sale by "stripping" the plants. Byford explained that for a few days each year he, along with Roller, Young, and about six other people, would gather to remove the leaves from the stalks of approximately 350 marijuana plants per year.

After Byford testified, the government presented the testimony of a forensic chemist and a customs agent. The forensic chemist identified a variety of state exhibits as containing marijuana and testified as to the weights of each exhibit. The Immigration and Customs Enforcement Special Agent, James Balsamo ("Balsamo"), testified

---

[2]Statements made by Stewart, White, and Holt to Foutch form the basis for some of Roller's and Young's arguments on appeal. The district court admitted Stewart's and White's statements as nonhearsay statements of coconspirators under Fed. R. Evid. 801(d)(2)(E). Holt's statements were admitted as nonhearsay because the district court determined that they were introduced to provide context and not to prove the truth of the matter asserted. These statements will be discussed in greater detail infra.

regarding the controlled delivery of a truck containing 2318 pounds of marijuana to 46 Judge Purser Hill Road on July 29, 2002. Balsamo explained that when the truck arrived, six Hispanic males unloaded the truck. Each of these individuals was later indicted on charges relating to the delivery. According to Balsamo, in addition to these six individuals, there were two white males present on the property on the day of the delivery. Balsamo stated that he saw a white pickup truck that looked like Young's truck at the delivery scene. Later Young spoke with Balsamo voluntarily and admitted that he was on the property on the day of the delivery. Young told Balsamo that it was Young's property but that Young had been trying to sell it to the current occupant, Jaime Valdivia-Perez. Young maintained that he had no knowledge regarding the seized truck or its contents. On cross-examination, Balsamo testified that the property's electricity was in the name of Jaime Valdivia-Perez and that Jaime Valdivia-Perez was arrested at the time of the delivery.

After Byford's testimony regarding the controlled delivery, the government called Charles Wayne Goff ("Goff") to the stand. At the time of his testimony, Goff was in federal prison for violating the conditions of his supervised release that had been imposed as part of his sentence for his conviction for conspiracy to manufacture methamphetamine. Goff testified that he had been involved in dealing marijuana with Young[3] since the mid to late 1980s and that for about four years in the mid-1990s, he sold Young around 100 pounds of marijuana per month.

After a second forensic chemist identified the contents of other government exhibits as marijuana, the government called the sheriff of Dekalb County. The sheriff testified that he had worked with Foutch while she was acting as a confidential informant and identified where various controlled buys involving Roller had taken place.

Next, Kerry Nelson ("Nelson"), a former undercover narcotics officer with the Rutherford County Sheriff's Department, testified. According to Nelson, in 1998 during a sting operation, he tried to sell fifty pounds of marijuana to Pete Murray ("Murray").

---

[3]Goff testified that he knew Roller but that he did not have a relationship with him "concerning marijuana." Joint Appendix ("J.A.") at 888-90 (Trial Tr. at 432-34).

Nelson explained that this sting was unsuccessful because when Murray arrived to purchase the marijuana, Murray told Nelson that they would have to go to "Jeff's" house to get the money. J.A. at 1001 (Trial Tr. at 545). Per protocol, Nelson refused to leave the planned purchase spot despite Murray's assurances that they would be safe from law enforcement because the sheriff was Jeff's cousin.

The next witness was Donna Parsley ("Parsley"), Roller's girlfriend. Under a grant of immunity, Parsley testified that she had once helped Roller count money and that Roller had told her that he had significant quantities of money buried in cans on his property.

After Parsley testified, the government called Billy Miller ("Miller"), a former investigator in Dekalb County. In 1998 or 1999, Miller placed a motion-activated camera near a marijuana patch in the woods. This camera captured an image of two men who were later identified as Roller and Young apparently cultivating the marijuana plants. Miller testified that Roller and Young were indicted based on these photographs but that their state-court trial ended in a hung jury.

Next, Ricky Estes ("Estes"), a truck driver from Woodbury, Tennessee, took the stand. Estes testified that on three or four occasions, he had helped Roller and Young strip marijuana.

Estes was followed on the stand by Kenneth Wayne Amonett ("Amonett"), another acquaintance of Roller and Young. Amonett was a regular marijuana user who had spent time in jail for marijuana-related offenses. Beginning in the late 1980s, Amonett bought increasingly large quantities of marijuana from Roller. Amonett stated that he had seen 200 pounds of marijuana in a barrel on Roller's property. Once, Amonett obtained a pound of marijuana from Young while Roller was out of town. Amonett told the jury that he had seen Roller growing marijuana and that he had helped Roller and Young strip marijuana. According to Amonett, Roller told him that Roller and Young almost had been caught when the police intercepted a truckload of marijuana intended for them.

After Amonett testified, the government called Kevin Murphy, a deputy with the Warren County Sheriff's Department, who testified regarding the search of Roller's property that was conducted when Roller was arrested. Next, Charlie Wilder, an officer with the Cannon County Sheriff's Department, testified regarding the search that was conducted after the truckload of marijuana was intercepted on Judge Purser Hill Road.

Then the government called Pete Murray ("Murray"), who testified that since the late 1980s he had been buying marijuana from Young and reselling it. When Young was out of town, Murray obtained marijuana from Roller. The bulk of Murray's testimony concerned recorded conversations between Murray and Young. After the government informed Murray that it had intercepted marijuana-related phone conversations between Murray and Young, Murray agreed to act as a confidential informant for the government and to record his conversations with Young. The government played recordings of Murray's conversations with Young, which Murray explained to the jury.

Murray testified that he had grown marijuana and that Young had advised him in this endeavor. On occasion, Murray had helped Roller and Young strip marijuana. Murray also mentioned a man who had offered to sell Murray fifty pounds of marijuana but who had abandoned the deal when Murray insisted that they needed to go to Young's house to complete the deal. Murray's testimony also contained various implications that area law enforcement was corrupt: Young once told Murray that Cannon County law enforcement would not bother Murray and that Roller and Young were not retried after their state-court trial for growing marijuana ended in a hung jury because they had paid the DA. Moreover, Murray testified that after the truckload of marijuana was intercepted, Roller and Young feared that the Mexicans were going to come after them and switched cars often. However, Murray also testified that Young told Murray that the owner of the truckload of marijuana had apologized to Young for bringing law enforcement to Young's property.

After Murray's lengthy testimony, the government recalled Delaney, the Tennessee Bureau of Investigation case agent, who testified regarding the government's relationship with Murray. According to Delaney, an individual who "has five pounds

of pot [available] for sale continuously" is involved in "upper level distribution" of marijuana. J.A. at 1377 (Trial Tr. at 921).

As the final part of its case in chief, the government read into evidence the testimony that Roller and Young had given while they were on trial in state court for charges that the state brought based on the photographs taken in the marijuana patch. At that trial, Roller and Young stated that they could not identify themselves in the photographs, but, in any event, they were not there growing or tending marijuana.

After the government closed its case, Roller called two witnesses: Billy Miller and Nell Roller, Roller's mother. Earlier in the trial, Miller had testified for the government, and Roller called him because of some confusion over Miller's exact testimony in Roller's and Young's prior state-court trial. Roller's mother testified regarding Roller's family, the fact that Roller was unable to read and write, and Roller's tendency to exaggerate. Young called one witness, John Barker, a utility-company official, who testified that the electricity subscriber at 46 Judge Purser Hill Road at the time that the marijuana was intercepted was Jaime Valdivia-Perez. In rebuttal, the government recalled Delaney, the case agent, to testify regarding Roller's and Young's tax records.

In its closing statement, the government summarized the evidence that had been presented, focusing on the testimony of individuals who had stated that they had bought marijuana from or sold marijuana to Roller and Young. The government concluded by discussing the quantities of marijuana involved in the evidence it had presented.

In closing, Roller's counsel argued that many of the government's witnesses were drug addicts and that they were not credible. Roller's counsel admitted that Roller had sold some marijuana, but told the jury that the government had not proved that Roller had been involved with 1000 or more plants or 1000 or more kilograms. Young's counsel began his closing statement by arguing that there was not enough proof to tie Young to the intercepted truckload of marijuana. Young's counsel highlighted the fact that the government had presented little evidence beyond the memories of drug users to prove that Roller and Young had been involved in large-scale drug trafficking for many

years.   After a brief final closing statement by the government, the district court instructed the jury.

During deliberations, the jury sent out the following question:  "On count one is it necessary for conspiracy to run from 1992-2006 to [f]ind guilty?"  J.A. at 335 (Jury Communication).  The district court responded as follows:  "To find a defendant guilty on Count One, you must find that there was a conspiracy that began 'in or about' 1992 and lasted to 'in or about' May 2006.  However, to find a defendant guilty on Count One you are not required to find that a defendant was a member of the conspiracy from the beginning of the conspiracy."   J.A. at 336 (Judge Communication).   Following deliberations, the jury found Roller and Young guilty of a conspiracy involving at least 100 but less than 1000 marijuana plants and kilograms of marijuana.  The jury found Roller guilty of counts two through five, counts seven through twelve, and counts sixteen, seventeen, and twenty.  The jury found Young guilty of counts six, thirteen through fifteen, eighteen, and nineteen.

After the verdict, the district court sentenced Roller and Young.  Roller's counsel objected to the amount of marijuana listed in the presentence report and argued that because the jury had found Roller guilty of a conspiracy involving at least 100 but less than 1000 kilograms of marijuana, Roller should not be sentenced based on a higher quantity of marijuana.  After hearing arguments by counsel, the district court determined the government had shown to a preponderance of the evidence that the intercepted truckload of marijuana belonged to Roller and Young.  Although this truckload contained 2318 pounds of marijuana and was sufficient to put Roller and Young over the 1000 kilogram (or 2200 pound) threshold alleged by the government, the district court also found that Roller been involved with the 11 pounds of marijuana found at his house, the 15 pounds he sold to Foutch, and 400 pounds as an estimate of what he would have received from one trip to Mexico.  The district court found that Roller had been involved with 2744 pounds of marijuana, enough to merit the base offense level of 32 requested by the government.

The district court decided that it was improper to impose a sentencing enhancement for possessing a dangerous weapon. The district court also found that it was improper to add two levels for obstruction of justice, despite possible perjury in a previous state trial, because Roller had not lied before the district court. Because Roller had gone to trial to contest the amount of marijuana involved, the district court declined a sentence reduction for acceptance of responsibility. The district court concluded that a leadership enhancement was proper because Roller and Young were partners who hired people to help them strip marijuana.

After making these determinations, the district court concluded that Roller's Guidelines range was 188 to 235 months of imprisonment, as determined by his offense level of 36 and his criminal history category of I. The district court sentenced Roller to a total of 200 months of imprisonment, 4 years of supervised release, and a fine of $10,000.

As it had with Roller, the district court concluded that the presentence report appropriately based Young's sentence on his involvement with a conspiracy involving more than 1000 kilograms of marijuana. Specifically, the district court found that the government had proved to a preponderance that Young was involved with the 2318-pound intercepted truckload of marijuana. Additionally, the district court found that Young had sold at least 530 pounds of marijuana to Murray and that "the testimony of Mr. Goff would certainly put the quantity well in excess of 2200 pounds." J.A. at 1620 (Sent'g Tr. at 67). The district court next concluded that it was proper to enhance Young's sentence by four levels because of his leadership role in the conspiracy. Despite his prior convictions, the district court declined to sentence Young as a career offender.

The district court placed Young in the same Guidelines range as Roller: 188 to 235 months of imprisonment based on an offense level of 36 and a criminal history category of I. The district court sentenced Young to 224 months of incarceration, eight years of supervised release, and a $15,000 fine.

On appeal, Roller and Young raise four issues in common alleging that: (1) the district court erroneously admitted hearsay; (2) the district court erred when it applied a leadership-role sentencing enhancement; (3) the district court erred in considering acquitted conduct in sentencing; and (4) their sentences were procedurally and substantively unreasonable. Young also argues that the district court erred when it admitted statements by Roller regarding the use of force to collect drug-related debts. Roller asserts that the district court's response to the jury's question regarding the duration of the conspiracy was prejudicial error. We have jurisdiction to review this appeal of the district court's final judgment pursuant to 28 U.S.C. § 1291. Jurisdiction to review the sentences imposed by the district court is provided by 18 U.S.C. § 3742.

## II. ANALYSIS

### A. Hearsay

#### 1. Coconspirators' Statements

Roller and Young appeal the district court's decision to admit certain testimony as nonhearsay statements by coconspirators made "during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In order for a statement to be admitted under Rule 801(d)(2)(E), the offering party must prove by a preponderance that "'the conspiracy existed, that the defendant was a member of the conspiracy, and that the co-conspirator's statements were made "in furtherance of the conspiracy."'" *United States v. Payne*, 437 F.3d 540, 544 (6th Cir. 2006) (quoting *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc)). The district court can consider the contents of the statement in making this determination, but the statements "must be corroborated by independent evidence." *Id.* "'In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, and reviews for clear error the court's factual determinations that underpin its legal conclusions.'" *Id.* (quoting *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005)).

Roller and Young appeal the district court's decision to admit under Rule 801(2)(d)(E) statements made by White and Stewart to Foutch. Foutch testified that she attempted to collect money that White and Stewart owed Roller. The government sought to introduce tapes of conversations that Foutch had with White and Stewart. At the time of Foutch's testimony, the district court conditionally admitted the conversations under Rule 801(2)(d)(E). Young also appeals the district court's decision to allow Nelson, an undercover officer, to testify that while Nelson was trying to sell Murray marijuana as part of a sting operation, Murray told Nelson that they would have to go to "Jeff's" house to get the money necessary to complete the deal.

At the conclusion of the government's case, the district court found that the statements had been admitted properly under 801(d)(2)(E) and reasoned as follows:

> [T]he first objection under 801(d)(2)(E) that I noted was a statement by Jimmy White on Page 24 and 25 of the Foutch transcript where he says, that you know, among other things that, yeah, we have done some, talking about he and, I guess, Mr. Roller, they've done some stuff and traded around, and, no, it wasn't cows. And they're talking about him owing money to Mr. Roller. And I think that the evidence in the case due to the basic quantities involved here, in fact, and the fact that Roller apparently fronted marijuana to Mr. White, I think that it's fair to say that Mr. White was not just a purchaser, Mr. White was a dealer, and was just one cog in the chain here of distribution. And so, I think that these statements about him owing money to Mr. Roller are statements made in furtherance of the conspiracy. So, I do find that, number one, the conspiracy existed by a preponderance of the evidence. Second, that Mr. Roller was a member of it, and as well as Mr. Young. And that these statements by Mr. White were made in furtherance of the conspiracy. So, the objection to those statements are respectfully overruled.
>
> The next note that I have here, . . . February 2nd, 2004, phone call with Kenny Stewart. I think it's Pages 41 and 42 of the Foutch transcript. Again, you know, Stewart is begging off on the paying right away, he says it's a bit slow. It's another one of these conversations about paying Mr. Roller. Again, I think that Mr. Stewart was in addition to being a purchaser from Mr. Roller, a distributor, for the same reasons that Mr. White was. And so, I find, number one, that a conspiracy did exist. Number two, that each defendant was a member of that conspiracy. Finally, that Mr. Stewart's comments and discussion with Mrs. Foutch here were in furtherance of the conspiracy.

Next, the note I had, next note I had was March 12th, 2004, another Kenny Stewart conversation regarding paying Mr. Roller. I think it's Pages 48 through 50 of the transcript. I don't know if it's true or not, but Stewart talks about getting ripped off by some people, but, anyway, again, we're talking about why, why he can't pay, why he's having difficulty in paying Mr. Roller. . . . [F]or the same reasons, we're talking about making drug payments to Mr. Roller. And, of course, as a part of, as a part of this conspiracy and in furtherance of the conspiracy. And, of course, Mr. Roller wouldn't be distributing drugs to Mr. Stewart if he wasn't getting paid. And so, I find that the conspiracy did exist. And that Mr. Roller, as well as Mr. Young were members of it. And that these statements were made in furtherance of the conspiracy.

Finally, my final note was statements by Mr. Murray to Sergeant Nelson . . . about bringing pot to Jeff where the money would be waiting.

\*\*\*

[Murray said] he would have to go back to Jeff to check because Jeff had the money and so forth. Well, that clearly, that clearly was in furtherance of the conspiracy. It never did come to a fruition, I guess because the deal didn't go down, but let's put it this way, that Mr. Murray at this time was acting in furtherance of the conspiracy because he was trying to get some marijuana at a time when the supply, I guess, was a little short, as I recall.

But, again, I find specifically that a conspiracy did exist and that being the conspiracy alleged in Count 1. That both defendants were members of it, including Mr. Young in this particular case. And that the statements made according to the undercover, then undercover agent quoting Mr. Murray, those statements by Mr. Murray were made in furtherance of the conspiracy.

J.A. at 1407-10 (Trial Tr. at 951-54).

On appeal, Young asserts that these statements show only a buyer-seller relationship, and that such a relationship is insufficient to establish a conspiracy.[4] Roller and Young argue that the statements in question were not made during the course and in furtherance of the conspiracy. We review for clear error the district court's factual findings that there was a conspiracy, that Roller and Young were a part of it, and that the statements in question were made during the course and in furtherance of it. *Gessa*, 971 F.2d at 1261. Especially in light of the extensive testimony regarding marijuana sales

---

[4]Roller admits that there was enough evidence for the district court to find by a preponderance that there was a conspiracy of which Roller was a member.

and cultivation, we conclude that it was not clear error for the district court to determine, at the end of the government's case, that the government had proven to a preponderance that Roller and Young were members of a conspiracy.

Roller and Young's argument that the government had not sufficiently proved that White and Stewart were coconspirators raises a closer question. Roller and Young correctly note that we have held that a "'buyer-seller relationship' is not enough to make someone a participant in a drug conspiracy, 'further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy.'" *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004) (quoting *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999)). However, we have also held that "the 'trust' involved in 'fronting' drugs under a delayed payment or credit arrangement, 'suggests more than a buyer-seller arrangement between the parties.'" *Id.* (quoting *United States v. Humphrey*, 287 F.3d 422, 435 (6th Cir. 2002), *overruled on other grounds, United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002)). Additionally, we have held that the involvement of a large quantity of drugs can "create[] an inference of a conspiracy." *United States v. Bourjaily*, 781 F.2d 539, 545 (6th Cir. 1986).

Although it is a close question, we conclude that the district court did not commit clear error in finding that White and Stewart were coconspirators and that the statements in question were made in furtherance of the conspiracy. As the district court noted, both men owed Roller significant sums of money, indicating that Roller had fronted them drugs and that the quantities involved were not minimal. Additionally, receiving payment due is a critical portion of any conspiracy to sell narcotics. Similarly, the district court's conclusion that Murray was a coconspirator was not clearly erroneous; Murray made the statement in question during an attempt to purchase a large quantity of marijuana, the statement named Young, and Murray later admitted extensive marijuana-related involvement with Young. We review de novo the district court's determination that these "facts warrant the legal conclusion under Rule 801(d)(2)(E) that the statements are admissible." *United States v. Rogers*, 118 F.3d 466, 477 (6th Cir. 1997). Given the evidence that larger quantities, repeat sales, and fronting were

involved, the district court did not err in admitting the statements in question as nonhearsay coconspirator statements.

Additionally, even assuming that the district court erred in admitting White, Stewart, and/or Murray's statements under Rule 801(d)(2)(E), we conclude that any error was harmless. Fed. R. Crim. P. 52(a). "The erroneous admission of a statement by an unindicted co-conspirator constitutes harmless error when sufficient other evidence demonstrates a defendant's active involvement in the conspiracy." *Rogers*, 118 F.3d at 478; *see also United States v. Conrad*, 507 F.3d 424, 431 (6th Cir. 2007) (applying *Rogers* test and finding other evidence insufficient). White's and Stewart's statements were only a small part of Foutch's testimony, and other witnesses such as Foutch, Murray, and Amonett testified that they had bought, sold, and prepared large quantities of marijuana with Roller and Young. Given this volume of evidence relating to a marijuana-based conspiracy, we must conclude that any error in admitting these statements was harmless.

### 2. Holt's Statements

Roller objects to the introduction of recorded statements that Holt made to Foutch. When Foutch tried to collect money from Holt for Roller, Holt used profanity, threatened Foutch, and hit Foutch in the side of the head with a hammer. The district court admitted these statements as nonhearsay introduced for context despite counsel's objection that the statements were unfairly prejudicial. On appeal, Roller argues that these statements should not have been admitted because their unfair prejudicial effect outweighed their probative value.[5] Fed. R. Evid. 403.

"'In reviewing the trial court's [Rule 403] decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Jackson*, 473 U.S. 660, 668 (6th Cir. 2007) (quoting

---

[5]Roller does not appear to argue that the statements were improperly determined to be nonhearsay. Roller Br. at 34.

*United States v. Moore*, 917 F.2d 215, 233 (6th Cir. 1990), *cert. denied*, 499 U.S. 963 (1991)). Applying this deferential standard, we conclude that the district court did not abuse its discretion. Although Holt did use strong language, Foutch had already testified that Holt hit Foutch in the head with a hammer. It seems unlikely that, given this context, Holt's language would have caused substantial unfair prejudice. Additionally, Holt's statements did provide background on the conversation that resulted in Foutch being hit with a hammer. Even assuming that the district court erred, we conclude that the error is harmless because the language does not produce as much prejudice as the hammer attack itself, which is unchallenged.

## B. Statements Regarding Use of Force[6]

Young argues that the district erred when it allowed the government to "present testimony that co-defendant Roller obtained [sic] drug debts by force or threat of physical violence" without even a limiting instruction.[7] Young Br. at 23. Young asserts that the "evidence that co-defendant Roller used extortion to obtain [sic] drug debts is minimally probative, if at all, as to Defendant Young's participation in the conspiracy. No evidence was presented to connect Defendant Young in any way to his co-defendant's actions in collecting debts." *Id.* at 25. Young argues that the introduction of this testimony was unfairly prejudicial in violation of Rule 403.

As discussed above, "[i]n reviewing the trial court's [Rule 403] decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Jackson*, 473 U.S. at 668 (internal quotation marks omitted). Young incorrectly asserts that no evidence connected him to

---

[6]Roller does not raise this argument on appeal.

[7]In the last sentence of the section of his brief dealing with this issue, Young argues that the district court should have severed the trials. Young makes no argument specifically relating to severance, instead focusing on the prejudicial quality of the admitted evidence. The government asserts that this severance argument is unpreserved and subject to plain-error review. Even if Young preserved the severance argument, in order to prevail Young must "show 'compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever.'" *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)). Young's brief mention of severance does not meet this high standard, and reversal on this ground is inappropriate.

Roller's attempts to collect debts. Foutch testified that Roller and Young were present when Roller asked her to collect money from drug debtors and that Young told her to take the title to Holt's car if Foutch was unable to get money from Holt. The government's theory was that Roller and Young were partners in an extensive drug conspiracy. Although the information relating to debt collection was largely based on Foutch's conversations with Roller, the overall evidence in the case does not suggest that Young was distanced from the debt-collecting segment of the conspiracy. Additionally, the testimony regarding debt collection had probative value insofar as it showed that Roller and Young were willing to extend credit to drug purchasers.

Even assuming that the district court erred as to Young in admitting testimony regarding debt collection, we conclude that this error was harmless. Roller and Young did not face any extortion charges or any charges involving violence. There was ample other evidence of a conspiracy between Roller and Young, including testimony regarding stripping marijuana and detailed testimony from individuals who had been involved in dealing drugs with Roller and Young for many years. Therefore, we reject Young's argument that admission of statements regarding debt collection constituted reversible error.

## C. District Court's Response to Jury Question Regarding Conspiracy Duration[8]

During deliberations, the jury sent out the following question for the court: "On count one is it necessary for conspiracy to run from <u>1992</u>-2006 to [f]ind guilty?" J.A. at 335 (Jury Communication). Over objections by Roller's and Young's counsel, the district court gave the following answer: "To find a defendant guilty on Count One, you must find that there was a conspiracy that began 'in or about' 1992 and lasted to 'in or about' May 2006. However, to find a defendant guilty on Count One you are not required to find that a defendant was a member of the conspiracy from the beginning of the conspiracy." J.A. at 336 (Judge Communication).

---

[8]Young does not raise this argument on appeal.

Roller argues that the second sentence of the judge's answer was unfairly prejudicial because it reemphasized a portion of the jury charge that the jurors had not asked about. Roller does not suggest that the answer misstated the law. Instead, Roller asserts that the jury asked only about the span of the conspiracy and that the court's inclusion of a statement that conviction did not require a finding that each individual had been a member of the conspiracy from the beginning was not responsive. Accordingly, Roller argues, this non-responsive portion of the district court's answer would have "suggested to the jury that the part of the charge reflected in the second sentence of the court's response was what was important and that the jury should focus on that." Roller Br. at 36.

"'The district court's actions in responding to questions from the jury are reviewed for abuse of discretion.'" *United States v. Khalil*, 279 F.3d 358, 367 (6th Cir. 2002) (quoting *United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992)). There is a "'high standard for reversal of a conviction on the grounds of improper instructions.'" *Id.* (quoting *United States v. Sheffey*, 57 F.3d 1419, 1429 (6th Cir. 1995), *cert. denied*, 516 U.S. 1065 (1996)). Under this high standard, an appellate court "'may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *Id.* (quoting *United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir.), *cert. denied*, 510 U.S. 832 (1993)).

We cannot conclude that the district court abused its discretion. In its initial jury charge, the district court stated that a conspiracy conviction "does not require proof that the defendant knew everything about the conspiracy, or everyone else involved, *or that he was a member of it from the very beginning*." J.A. at 126 (Jury Charge at 25) (emphasis added). This language follows Sixth Circuit Pattern Jury Instruction § 3.03(2). The district court's response to the jury's question reiterated the correct legal standard that had already been presented to the jury. Although the district court's response may have gone beyond the scope of the jury's question, Roller has not shown that the district court abused its discretion in doing so. Because we cannot conclude that the district court abused its discretion, we deny Roller relief on this ground.

**D.  Use of Acquitted Conduct Regarding Drug Amount in Sentencing**

Roller and Young were indicted for a conspiracy to manufacture 1000 or more marijuana plants and to distribute 1000 or more kilograms of a substance containing marijuana.  At trial, the jury found Roller and Young guilty of conspiracy, but determined that the conspiracy did not involve 1000 or more marijuana plants or 1000 or more kilograms of marijuana.  Instead, the jury convicted Roller and Young of a conspiracy involving at least 100 but less than 1000 marijuana plants and at least 100 but less than 1000 kilograms of marijuana.  Although the jury thereby acquitted Roller and Young of a conspiracy involving the larger quantity of marijuana, the district court sentenced Roller and Young based on the larger amount.  Roller and Young argue that their sentences were impermissibly based on this higher amount of which the jury had acquitted them.

In a factually similar case where the defendant was sentenced based on a quantity of drugs of which the jury had acquitted him, a panel of this court held that "a post-*Booker* sentencing court may consider even 'acquitted conduct' if it finds facts supporting that conduct by a preponderance of the evidence." *United States v. Mendez*, 498 F.3d 423, 427 (6th Cir. 2007).  In another case involving acquitted conduct subsequently heard by this court en banc, a majority of the judges of this circuit concluded that a district court may use acquitted conduct that it finds to a preponderance to enhance a defendant's sentence "so long as the resulting sentence does not exceed the jury-authorized United States Code maximums."[9]  *United States v. White*, --- F.3d ---, 2008 WL 5396246, at *1 (6th Cir. 2008) (en banc).

Given this holding by the en banc majority, we must reject Roller's and Young's arguments that acquitted conduct cannot be used to enhance their sentences.  However, we still must review the district court's decision to evaluate whether the acquitted quantity was proven by a preponderance.  "A district court's determination of the quantity of drugs used to compute a defendant's sentence is a finding of fact that should

---

[9]Because the maximum sentence for Count One alone is forty years, Roller's and Young's sentences do not violate this limitation on sentence length.  21 U.S.C. § 841(b)(1)(B)(vii).

be upheld unless clearly erroneous. The district court's finding must be supported by a preponderance of the evidence." *United States v. Hoskins*, 173 F.3d 351, 354 (6th Cir. 1999) (citation omitted). The inclusion of a drug quantity that has not been proven by a preponderance constitutes clear error. *See, e.g.*, *Gibbs*, 182 F.3d at 440-45 (analyzing in detail findings underlying district court's determination of drug quantity).

At sentencing, the district court specifically addressed the question of drug quantity. The district court found 2744 pounds[10] attributable to Roller: eleven pounds that was found in his freezer, fifteen pounds that he sold to Foutch, 400 pounds as an estimated quantity that would be recovered on one trip to Mexico, and the 2318 pounds that was found in the intercepted truck. With respect to Young, the district court was less precise, but it specifically attributed to Young the 2318 pounds from the intercepted truck and 530 pounds as an estimate of what Young had sold to Murray over the course of 15 years.[11] These findings attribute 2848 pounds of marijuana to Young. If the district court had not found to a preponderance that the intercepted truckload was connected to Roller and Young, Roller and Young could have been sentenced only in accordance with the jury finding that the conspiracy involved at least 100 but less than 1000 kilograms of marijuana. Because the other quantities found by the district court were either admitted by Roller and Young or fell within the quantity range authorized by the jury verdict, our analysis focuses on the district court's determination that there was sufficient evidence connecting Roller and Young to the intercepted truckload of marijuana.

Although it is an extremely close question, we conclude that it was not clear error for the district court to conclude that the government had shown, to a preponderance,

---

[10] One thousand kilograms is equivalent to 2200 pounds.

[11] The district court also mentioned that "the testimony of Mr. Goff would certainly put the quantity well in excess of 2200 pounds," but the district court did not make any specific findings regarding the quantity involved, nor did it explain whether this quantity alone would rise to the 1000 kilogram threshold or if it would do so only in conjunction with the intercepted truckload. J.A. at 1620 (Sent'g Tr. at 67). Given this lack of information and the specificity of the district court's other quantity-related findings, we conclude that the district court did not include a specific amount based on Goff's testimony. Therefore, we do not consider this quantity of drugs when reviewing the district court's sentencing determination.

that the intercepted truckload of marijuana was attributable to Roller and Young. The district court based its findings on the fact that the marijuana was sent to Roller and Young's property,[12] that Roller and Young obtained marijuana from Mexico, that there was a truck resembling Young's in the area on the day of the delivery, and that Roller and Young changed cars frequently because they were afraid that "the Mexicans were going to come after them." J.A. at 1568-69 (Sent'g Tr. at 15-16). There is, however, conflicting evidence that the district court did not mention. First, there was evidence that one of the individuals who was arrested at the scene of the delivery, Jaime Valdivia-Perez, was occupying the property at that time. Second, there was testimony that the owner of the truckload of marijuana had apologized to Young for drawing law enforcement to Young's property. Finally, there was little, if any, other evidence that Roller and Young dealt in quantities of marijuana as large as that found in the intercepted truck.

This circuit has held that the district court cannot assume that any drugs in a given area belong to defendants who are major drug dealers in that area. *Hoskins*, 173 F.3d at 356-57 ("The reasoning of the district court implies that because [the defendants] were two top dealers in the area, any marijuana grown and sold in the area was attributable to each of them. We believe the sentencing guidelines require a more particularized finding."). In this case, however, the district court made particularized findings related to evidence presented at trial and did not rely on an assumption that because Roller and Young were large-scale drug dealers in the area, the truckload of marijuana must have been theirs. Although the question of whether the government proved to a preponderance that the truckload was attributable to Roller and Young is a close one, we conclude that the district court did not clearly err when it concluded that

---

[12]On appeal, Roller asserts that the property in question was owned by Young alone. Balsamo's testimony that Young stated that Young owned the property supports Roller's assertion. However, at his sentencing hearing, Roller failed to object to the district court's statement that the property "belonged to, partly to Mr. Roller, and, of course, Mr. Young, as well." J.A. at 1568 (Sent'g Tr. at 15). Additionally, given the fact that the jury convicted Roller and Young of being coconspirators in a conspiracy to distribute marijuana, the exact ownership of the property is not critical.

the government had done so.**13** Were we reviewing the evidence ourselves, under a preponderance of the evidence standard, we might reach a different result, but we cannot conclude that the district court's findings constituted clear error.

**E. Leadership-Role Enhancement**

At sentencing, the district court found that Roller and Young each played a leadership role in a conspiracy that involved five or more participants. The district court therefore applied a four-level enhancement to Roller's and Young's base-offense levels pursuant to United States Sentencing Guidelines § 3B1.1(a). There is confusion within this circuit concerning the standard of review that should be applied to a district court's decision to impose a leadership enhancement under § 3B1.1. *See United States v. Walls*, 546 F.3d 728, 734 (6th Cir. 2008). "When reviewing § 3B1.1(a) impositions in the past, 'we reviewed the district court's factual findings for clear error and its legal conclusions de novo.'" *Id.* (quoting *United States v. McDaniel*, 398 F.3d 540, 551 n.10 (6th Cir. 2005)). "However, in 2001, 'the Supreme Court ruled in *Buford v. United States* that, in light of the fact-bound nature of the legal decision, an appellate court should review deferentially, rather than de novo, a district court's application of U.S.S.G. § 4B1.2.'" *Id.* (quoting *McDaniel*, 398 F.3d at 551 n.10). Some cases in this circuit suggest, without discussing *Buford*, that "'[a] district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous.'" *United States v. Jeross*, 521 F.3d 562, 579 (6th Cir. 2008) (quoting *United States v. Gates*, 461 F.3d 703, 709 (6th Cir.), *cert. denied*, 127 S. Ct. 602 (2006)). Other cases state that "[w]e have not settled the question of what standard governs review of a sentencing enhancement under U.S.S.G. § 3B1.1." *United States v. Moncivais*, 492 F.3d 652, 660 (6th Cir. 2007).

---

**13**We note that even if the intercepted truckload of marijuana is eliminated from consideration, during sentencing the district court did not exhaustively consider all of the quantities of marijuana which had been presented at trial. For example, the district court did not determine the amount of marijuana that was stripped or grown by Roller, Young, and the individuals they hired. Nor did the district court decide the amounts that had been sold to or bought from every individual who testified. Because the district court did not find any of these quantities to a preponderance, we do not consider whether these quantities, apart from the truckload of marijuana, could justify the district court's sentencing determination.

Under either standard of review, clear error or de novo, we conclude that Roller's and Young's arguments fail. During Roller's sentencing hearing, the district court found that the role enhancement was proper because "[t]here was ample testimony during the course of the trial that the defendant was an organizer and leader of criminal activity that involved five or more participants." J.A. at 1593 (Sent'g Tr. at 40). The district court determined that Roller and Young were partners and noted that the marijuana-stripping operations involved more than five participants and that Roller had "boys from the mountain" to help collect his debts. J.A. at 1593-94 (Sent'g Tr. at 40-41). With respect to Young, the district court noted that many people were involved in stripping marijuana and in transporting marijuana from Mexico. The district court also stated that "even if you don't have five people, which I think you do, . . . it could still be otherwise extensive for the four levels." J.A. at 1624-25 (Sent'g Tr. at 71-72).

"Regardless of the exact parameters of 3B1.1(a) review in light of *Buford*, it is clear that factual findings made by the district court are reviewed for clear error." *Walls*, 546 F.3d at 735. The evidence presented at trial supports the district court's determination that more than five people were involved in Roller's and Young's periodic marijuana-stripping endeavors. Even reviewing de novo the district court's conclusion that a four-point leadership enhancement was proper, we conclude that reversal is unwarranted. The evidence at trial showed that Roller and Young were involved with a large quantity of marijuana over the course of years; they bought, sold, cultivated, and manufactured marijuana, and much of this activity took place on and around their own property. Additionally, more than one witness testified regarding Roller's and Young's marijuana-stripping operations. By its nature, this work was seasonal, but Roller and Young repeatedly and regularly hired more than five individuals to perform this task for them. We conclude that under either clear-error or de novo review, the district court's decision to impose this sentencing enhancement should not be overturned.

## F. Unreasonableness of Sentences

On appeal, Roller and Young argue that their sentences are unreasonable.[14] We review sentences for reasonableness under the standard the Supreme Court described in *Gall v. United States*, 128 S. Ct. 586, 597 (2007):

> Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range. Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

---

[14] In a footnote in its appellate brief, the government argues that because Roller and Young failed to raise "unreasonableness before the district court," we should review their sentencing claims for plain error. Gov't Br. at 52 n.5. However, this circuit's rule that plain-error review applies when we evaluate the sentence of a defendant who failed to object to the sentencing procedure after the sentence was imposed does not bar Roller's or Young's claims. *See United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc). This rule does not bar Roller's claims of procedural unreasonableness because after the district court imposed its sentence, the district court failed to ask Roller if he had any objections. The government admits that the district court did not make this inquiry, but asserts that Roller and his counsel left the courtroom before the district court had a chance to ask. This argument is belied by the transcript which shows that Roller's counsel and the district court spoke about sentencing details before Roller left and that the district court gave Roller permission to leave. Because he was not asked if he objected to his sentence, Roller's claims of procedural unreasonableness are not subject to plain-error review. *Vonner*, 516 F.3d at 385-86.

Young makes one argument regarding the reasonableness of his sentence—that his sentence was unreasonable because it is "greater than that necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2)." Young Br. at 36. We have held that "[a] litigant has no duty to object to the 'reasonableness' of the length of a sentence (or to the presumption of reasonableness) *during* a sentencing hearing." *Vonner*, 516 F.3d at 389. Accordingly, neither Roller nor Young was required to object after the district court imposed its sentences in order to preserve claims of substantive unreasonableness.

Under this standard, reasonableness review has two components: procedural and substantive.

### 1. Review for Procedural Reasonableness

Review for procedural reasonableness is a three-step inquiry. An appellate court must determine whether the district court: "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

Roller argues that his sentence was procedurally unreasonable and that the district court improperly calculated the Guidelines range because the district court considered acquitted conduct in determining the base offense level and erroneously applied a four-level leadership enhancement.[15] Roller also asserts that the district court impermissibly considered the role of public corruption in the conspiracy (which, Roller argues, was only attributed to Young). Roller further argues that the district court impermissibly considered that Roller would have had a criminal record but for the fact that the jury in Roller's state trial failed to reach a verdict.

We conclude that the district court did not abuse its discretion by considering improper factors. The district court mentioned public corruption, but it did so in the context of considering how Roller's sentence would "promote respect for the law," one of the factors a court must consider when imposing a sentence. J.A. at 1607 (Sent'g Tr. at 54); 18 U.S.C. 3553(a)(2)(A). Immediately before the district court mentioned the fact that Roller had "escaped judgment in the state court," the district court also stated that Roller's lack of a criminal history was "a favorable factor." J.A. at 1608 (Sent'g Tr.

---

[15]We rejected above Roller's claims that the leadership enhancement and the district court's use of acquitted conduct were improper, and we will not reconsider them here.

at 55). In this context, it does not seem that the district court used Roller's prior brush with the law against him or that the district court abused its discretion by mentioning this prior trial.

The district court's sentencing decisions relating to Roller (as well as Young) specifically mentioned the § 3553(a) factors that led the district court to select their sentences. The district court's sentencing decisions referenced specific evidence from trial and the § 3553(a) factors that it found critical. The district court also specifically mentioned the mitigating evidence that Roller had presented, and noted that it believed that Roller had a good side that had been overshadowed by his bad role in a drug conspiracy. Given the district judge's explanations for the sentences it imposed and the deferential standard of review, we conclude that the district judge did not commit any significant errors and that Roller's sentence should not be overturned for procedural unreasonableness.

## 2. Review for Substantive Reasonableness

Because we conclude that Roller's and Young's sentences are procedurally reasonable, we must consider the substantive reasonableness of their sentences. *Bolds*, 511 F.3d at 581. This court has held that sentences that fall within the Guidelines are presumed to be reasonable. *Vonner*, 516 F.3d at 389-90. This presumption is rebuttable, but an appellate court should not overturn a sentence just because it believes that another sentence would be appropriate. *Id.*; *see also Gall*, 128 S. Ct. at 597. Roller's and Young's sentences fall within the Guidelines range of 188 to 235 months and thus are rebuttably presumed to be substantively reasonable.

Roller argues that his sentence is substantively unreasonable for three reasons: "(1) the district court failed to accord the proper weight to mitigating evidence under § 3553(a), (2) imposed a sentence that was greater than necessary, and (3) failed to avoid unwarranted sentencing similarities [sic] between the defendant and his co-defendant's sentences or sentencing disparities with other defendants." Roller Br. at 55. Young joins Roller in the first two arguments, asserting that his sentence "is greater than that

necessary to comply with the purposes of § 3553(a)(2) and does not adequately take account of [Young's] history and characteristics." Young Br. at 36.

Because the district court sentenced Roller and Young within the Guidelines, their sentences are presumed reasonable. We conclude that Roller and Young have not rebutted this presumption. Roller and Young did present mitigating evidence in the form of numerous letters from family and community members. Although the district court did not conclude that a sentence reduction was appropriate based on these letters, it specifically considered the letters before imposing Roller's and Young's sentences. The district court also enumerated the specific evidence and the § 3553(a) factors that led it to believe that the sentences it imposed were appropriate. Given the deferential standard of review, we decline to reverse Roller's and Young's sentences.

As to Roller's argument that his sentence was disproportionate when compared with Young's, we note that Roller and Young were sentenced within the same Guidelines range because the district court determined that Young's prior convictions did not increase his criminal history level for Guidelines purposes.[16] The district court specifically stated that because of these convictions, Young merited a higher sentence within that Guidelines range, and the district court sentenced Young to two additional years of incarceration and four additional years of supervised release. Given this explanation and the fact that the district court did not ignore the difference in prior criminal convictions, we cannot conclude that the district court abused its discretion by imposing a substantively unreasonable sentence on Roller. Accordingly, we **AFFIRM** the sentences imposed by the district court.

---

[16]Roller also asserts that his sentence is unreasonable when compared with other defendants convicted of the same type of offense. Roller Br. at 58. However, as Roller admits, he raises this issue for the first time on appeal, and we therefore review his claim for plain error. *Id.*; *United States v. Blackie*, — F.3d —, 2008 WL 4949909, at *3 (6th Cir. 2008) ("Because [the defendant] did not object to his sentence based on a potential disparity, . . . we now review [that] claim[] for plain error."). Roller's brief mention of this argument does not suffice to show that the district court committed plain error in imposing Roller's sentence.

## III.  CONCLUSION

For the reasons discussed above, we **AFFIRM** Roller's and Young's convictions and sentences.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

MERRITT, Circuit Judge, concurring in part and dissenting in part. The two first offenders here grew and distributed marijuana off and on over several years and were sentenced to 17 years and 19 years respectively. In my view this sentence is too long and serves no rational penal purpose. It is much greater than necessary to adequately deter marijuana growing and distribution. I would reverse and remand for a further explanation of why such a long sentence is justified, especially in light of the great disparity in sentencing for such relatively minor marijuana crimes between the state and federal courts and among federal judges themselves. These defendants will be over 70 years old when they get out of jail, if they live that long. The cost of their incarceration, including health care, will be enormous. The sentences seem irrational to me — too irrational for me to defer.[1]

For reasons stated in my dissenting opinion in *United States v. White*, No. 05-6596 (6th Cir. Dec. 24, 2008 (en banc)), I do not agree with the holdings and reasonings of Sections II.D and II.E of the majority opinion upholding the use of acquitted conduct and the judge-found, offense-conduct facts regarding the leadership enhancement. These sentencing enhancements are unconstitutional in my view. Although I concur that we must defer to the majority opinion in *United States v. White*, it is not final for all purposes and is likely to be reversed by the Supreme Court. These two enhancements are the basis for the long sentences and are inconsistent with the right of trial by jury under the Sixth Amendment, as I explained in *White*. Counsel for the defendants should keep the cases open until we find out what happens to the *White* case in the Supreme Court.

---

[1] The just-released "Overview" of the U.S. Sentencing Commission for 2007 shows that "the average punishment for drug crimes ranged from a high of . . . 40 months for marijuana offenders (with a median of 24 months)." The great disparity for the marijuana offenders in this case and in the normal case remains unexplained in the record.