RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 17-2285

SEAN MICHAEL FITZGERALD,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cr-00178-1—Robert J. Jonker, Chief District Judge.

Argued: April 26, 2018

Decided and Filed: October 15, 2018

Before: BATCHELDER, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Avram D. Frey, GIBBONS P.C., Newark, New Jersey, for Appellant. Justin M. Presant, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Avram D. Frey, Lawrence S. Lustberg, GIBBONS P.C., Newark, New Jersey, for Appellant. Justin M. Presant, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

McKEAGUE, J., delivered the opinion of the court in which BATCHELDER, J., joined. GRIFFIN, J. (pp. 18–27), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  On August 25, 2016, Talon Air pilot Sean Fitzgerald showed up rip-roaring drunk to the Traverse City, Michigan, airport.  Fitzgerald was set to fly that morning, so he went about readying a jet for take-off.  He conducted a walk-around safety check before entering the cockpit, where he calibrated the altimeter, programmed the flight-management system, turned on the auxiliary power unit, and requested flight clearance from air-traffic control.

Thankfully for the passengers yet to board, Fitzgerald's co-pilot recognized his inebriation and alerted Talon Air executives, who in turn notified local law enforcement.  Fitzgerald was arrested and charged under 18 U.S.C. § 342, which makes it a crime to operate a common carrier while intoxicated.  The jury convicted Fitzgerald, and the district court sentenced him to one year and one day in prison and to three years of supervised release.  On appeal, Fitzgerald contends that the actions he performed were not enough to operate the aircraft within the meaning of § 342, that the jury was wrongly instructed, and that the district court erred at his sentencing.  We **AFFIRM**.

**I**

On August 25, 2016, Sean Fitzgerald and Manuel Ramirez were scheduled to fly a private jet for Talon Air from Traverse City, Michigan to Bedford, Massachusetts.  The two planned to meet in the lobby of their hotel roughly two hours before their 8:20 a.m. scheduled departure.  Fitzgerald showed up late, and Ramirez said he immediately "felt" alcohol on Fitzgerald—his breath smelled of it, and his eyes were bloodshot.  Ramirez three times pressed Fitzgerald during their drive to the airport whether he was fit to fly.  Fitzgerald three times denied that anything was amiss.

Ramirez and Fitzgerald arrived at the airport around 7:00 a.m.  Ramirez questioned Fitzgerald a fourth time, but Fitzgerald again insisted he was fine.  Unconvinced, Ramirez took

matters into his own hands.  He asked Fitzgerald to stay put, then called his superiors at Talon Air, who in turn notified the Traverse City Police Department.

Meanwhile, Fitzgerald began to prepare the airplane for flight.  Fitzgerald ordered fuel; completed a "walkaround" inspection of the outside of the airplane; and entered the cockpit, where he calibrated the altimeter, programmed the flight-management system, turned on the auxiliary power unit, and requested flight clearance from air-traffic control.[1]

The police soon after arrived and found Fitzgerald in the cockpit, still tinkering with the airplane's controls.  The police ran Fitzgerald through a visual sobriety test, which Fitzgerald promptly failed. Two subsequent breath tests confirmed what his bloodshot eyes suggested: Fitzgerald was very drunk, registering a blood-alcohol content (BAC) of 0.301% and 0.312%.[2] Fitzgerald was arrested and taken to a nearby hospital for further examination; a blood test 90 minutes later revealed a 0.343% BAC.  For reference, a BAC of .10% gives rise to a presumption of intoxication under the statute.  18 U.S.C. § 343.  FAA regulations, meanwhile, prohibit acting or attempting to act as a crewmember of a civil aircraft with a BAC of 0.04% or higher—meaning that Fitzgerald's BAC was about eight times over that limit.  14 C.F.R. § 91.17(a)(4).

The government charged Fitzgerald with operating a common carrier while under the influence of alcohol in violation of 18 U.S.C. § 342.  Fitzgerald moved to dismiss the indictment on the basis that his preflight actions did not constitute operating the aircraft, but the district court denied the motion.  The parties nevertheless continued to wrangle in the lead-up to trial about what it means to "operate" an airplane.  In general, Fitzgerald argued for a more restrictive definition, contending that only actions taken once passengers were aboard or the engines were turned on could constitute operation.  The government urged a more flexible definition without such bright-line cutoffs.  After extensive briefing and a few iterations, the district court landed on the instruction at the heart of this case.

---

[1]Given the scope of this court's review of jury verdicts, the fact summary is presented in the light most favorable to the prosecution.

[2]"BAC" sometimes also refers to "blood alcohol concentration," but we use "content" since it is consistent with the United States Code.  *See* 18 U.S.C. § 343.

At trial, Fitzgerald admitted that he was intoxicated and that the airplane was a common carrier. The lone issue, therefore, was whether Fitzgerald "operated" the airplane. After proofs closed, Fitzgerald moved for a judgment of acquittal, which the district court denied. The jury convicted Fitzgerald, and the district court—after rejecting Fitzgerald's request for a downward departure—sentenced him to one year and one day in prison and to three years of supervised release. Fitzgerald now challenges the district court's interpretation of "operate," the sufficiency of the evidence supporting his conviction, the jury instructions, and his sentence.

**II**

The core question in this case is one that neither we nor any of our sister circuits have confronted: what does it mean to "operate" a common carrier under 18 U.S.C. § 342? Fitzgerald contends that the district court's erroneous definition of the term led it to mistakenly deny his motion for a judgment of acquittal and, eventually, caused the jury to wrongfully convict him. Section 342 provides:

> Whoever operates or directs the operation of a common carrier while under the influence of alcohol or any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), shall be imprisoned not more than fifteen years or fined under this title, or both.

The government thus had to prove three elements beyond a reasonable doubt: that Fitzgerald (1) operated or directed the operation of (2) a common carrier (3) while intoxicated. Because Fitzgerald concedes the aircraft he was preparing to fly was a common carrier and that he was intoxicated, the only question is the first element—whether his actions sufficed to "operate" the airplane. The district court instructed the jury as follows on the meaning of operate:

> The term "operate" generally means to run or control the functioning of something. For a commercial pilot this term includes anything the pilot does or directs in his capacity as a pilot before, during, or after flight, but only if the evidence convinces you beyond a reasonable doubt that the activity or direction was directly and proximately linked to actual operational or functional requirements for the flight and not simply some administrative or clerical task.

Fitzgerald says the instruction swept too broadly. He argues that to operate an airplane is to control its *movement*, and that because the airplane never moved—the engines in fact never started—he did not operate the aircraft. The government objects that Fitzgerald's definition is

unduly cramped and that the statute covers "the operation of the plane in *preparation* for it to move." Appellee Br. at 23 (emphasis added).[3] The district court's instruction, the government contends, rightly accounted for this.

We review this question of statutory interpretation de novo, *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013), though a well-trod path guides our inquiry. We start with the disputed term itself, which, if left undefined in the statute, must be given "its ordinary or natural meaning." *Id.* at 540 (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). If a word in isolation is susceptible of multiple meanings, however, we work outward and examine the statutory context, "consider[ing] not only the bare meaning of the word but also its placement and purpose in the statutory scheme." *Id.* (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). Last of all, working only within the range of "textually permissible meanings," we consider which of those interpretations would serve, rather than frustrate, the statute's manifest purpose. Antonin Scalia & Bryan A. Garner, *Reading Law* 57 (2012); *see John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94-95 (1993) (interpreting "language of the governing statute" in light of the statute's "object and policy").

*The Ordinary Meaning of "Operates."* The statute does not define the term "operate," so we can assume that Congress intended the word be given its ordinary meaning. *Miller*, 734 F.3d at 540. Dictionaries provide a helpful proxy. One defines "operate" as: "To cause or actuate the working of; to work (a machine, etc.)." *Oxford English Dictionary* 848 (2d ed. 1989). Another: "To work or use a machine, apparatus, or the like." *Random House Dictionary of the English Language* 1357 (2d ed. 1987). And another: "to cause to function usu[ally] by direct personal effort: work (a car) (operating a drill press)." *Webster's Third New International Dictionary of the English Language* 1581 (3d ed. 1986). Finally, there is the definition the district court incorporated directly into the jury instructions: "To run or control the functioning of." *American Heritage Dictionary* 1233 (4th ed. 2000).

Under each of the above definitions, Fitzgerald could be deemed to have "operated" the aircraft when he took certain preflight steps. Recall what Fitzgerald did: he calibrated the

---

[3]Interestingly, neither "movement" nor "preparation"—words stressed by the parties—appears in the statute.

altimeter (which calculates altitude), programmed the flight-management system (which controls navigation), turned on the auxiliary power unit (which provides energy for functions other than propulsion), and requested flight clearance from air-traffic control. Fitzgerald's actions by themselves were not *sufficient* to "cause" the airplane to take flight (as the Oxford and Webster's Dictionaries would say), but they were *necessary* steps along the way. And Fitzgerald was certainly "work[ing] or us[ing] a machine" under the Random House definition—he adjusted its instruments and programmed its flight path. On the same reasoning, Fitzgerald appears to have "run or control[led] the functioning of" the airplane under the American Heritage definition. The upshot of our dive into the dictionaries, then, is that "operate" comprises a wide universe of actions—anything that causes a machine to work, works a machine, or controls a machine's functioning. For the sake of clarity moving forward, we use the American Heritage definition that the district court used (a definition, by the way, to which both parties acceded below): to "operate" something is to run or control its functioning.

Still, questions of kind and degree remain. Ordinary usage may teach us that to operate something is to run or control it, but what *kind* of control must one exert over an airplane? Surely not every act of control can count—that would sweep in every mechanic who swaps out a part before take-off and any flight attendant who seals the airplane doors. And how *much* control must a pilot exercise? Commercial aircraft are almost always guided by two pilots; if one performs only 10% of those tasks necessary to operate the plane, has he operated it? Though we can safely say that a pilot "operates" a plane even while auto-pilot is engaged, what of the pilot who calibrates the plane's instruments while still on the ground? The word "operates" by itself does not suggest obvious limiting principles that help answer these questions. So, to context we turn. *Miller*, 734 F.3d at 540.

*Statutory Context.* However ambiguous "operates" may be in isolation, "context gives meaning." *United States v. Santos*, 553 U.S. 507, 512 (2008) (stating that a statutory term must be read "as it is used in the federal . . . statute"). Indeed, even were we convinced that "operates" had a clear definition in isolation, "[t]he meaning of statutory language, plain or not, depends on context." *Miller*, 734 F.3d at 540.

Fitzgerald contends that the statutory context strengthens his interpretation. Because § 342 is devoted to common carriers—planes, trains, buses, and ships—Fitzgerald argues "operates" must "be viewed as control relative to movement." That is, it's not enough to define operates as to "run or control the functioning of" the machine; instead, the person must "run or control the functioning of" the machine's "essential function." And since a common carrier's essential function is to move passengers from point A to point B, Fitzgerald says the ordinary meaning of operating a common carrier is to run or control "the movement necessary for travel and transportation." Fitzgerald hopes some analogies will illustrate his point. He argues that one does not "operate" a computer simply by opening the hardware and making a repair, even if one would say that action "controls the computer's functioning." Instead, a person operates a computer only when she uses it for its "central function, *i.e.*, use for personal computing." Likewise, Fitzgerald says one does not "operate" a bicycle by giving it a tune-up; that occurs only when a person "control[s] its essential function, *i.e.*, by riding it."

Fitzgerald has a point, but he takes it too far. Section 342 is indeed a law about common carriers, all of which have the goal of moving paying passengers from one place to another. It does make sense, then, to interpret "operates" by reference to movement. But why should the contextual North Star be "common carrier," as opposed to the specific type of common carrier at issue in a given case? A far more natural and sensible approach is to consider what it means to operate a bus, or a train, or a ship—or, in this case, an airplane—rather than to treat common carriers as a monolithic entity. A look to § 342's neighbor shows that Congress has done just that. *See* 18 U.S.C. § 341 (distinguishing various types of common carriers). And the safe and effective movement of an *airplane* is not determined by actions taken only after passengers board or the engines start or the airplane moves, which appear to be Fitzgerald's favored lines for demarcating when "operating" can begin. To the contrary, actions taken before any of these arbitrary boxes are checked might influence the aircraft's movement just as much as those taken after—a truth well borne out by the evidence in this case.[4] So, Fitzgerald is right that "operates"

---

[4] It is noteworthy that the dissent's proposed approach would create a more restrictive cut-off for operation than even Fitzgerald proposes, since the latter, after all, admits that activities "proximate" to movement might suffice to operate a common carrier. The dissent ties its definition of "operate" to its definition of "common carrier," arguing that an airplane does not become a common carrier until the instant it is transporting passengers or freight, so a pilot cannot operate a common carrier before that instant.

should be interpreted in a way that accounts for common carriers' essential movement function, but the government is right that "operates" should be read in light of the common-sense understanding that the safe and effective movement of a complex airplane depends on actions taken long before actual movement ever begins.[5]

Where does that leave us in our interpretive puzzle?  Somewhere, we think, right around the jury instructions given by the district court.  The instructions reflected the idea that to "operate" a common carrier is to control its movement by emphasizing that Fitzgerald's actions could only count as operating if they were connected to "the flight" of the airplane.  Yet the district court also understood that a definition limited only to activities during the flight itself would not work, because that would fail to account for the critical preflight activities pilots must complete to actually (and safely) move an aircraft.  So the district court interpreted "operates" to include pilot actions "directly and proximately linked to actual operational or functional requirements for the flight."

These instructions fit nicely in the context of operating a complex airplane, including the reality that preflight actions might well dictate the airplane's movement once the engines are fired up and the plane is in the air.  As the district court explained in its pretrial ruling on the instructions issue:

> [O]nce a commercial pilot steps on board the aircraft and into the cockpit, it is hard to characterize any activity undertaken as merely administrative.  The pilot is now in the physical location where he or she can access all of the aircraft controls.  The required pre-flight checks involve physically testing and checking the controls that will be used in flight—radio, rudder pedals, circuit breakers, autopilot and fuel gauges to name a few.  *Some of what the pilot does may actually directly control the function of the aircraft*, such as inputting flight-plan parameters that will engage when the autopilot feature takes over in flight.  The Court's proposed language takes these situations into account[.]

---

[5]This is an obvious point, and evidence at trial adequately established it, but the FAA's Airplane Flying Handbook makes it explicitly in its chapter on "Ground Operations":  "All pilots must ensure that they place a strong emphasis on ground operations *as this is where safe flight begins and ends*.  At no time should a pilot hastily consider ground operations without proper and effective thoroughness."  The Handbook is available at https://www.faa.gov/regulations_policies/handbooks_manuals/aviation/airplane_handbook/media/04_afh_ch2.pdf

R. 38, PID 107 (emphasis added).  And indeed, the evidence at trial showed Fitzgerald completed at least one of those preflight actions that directly control the airplane's in-flight movement.  Fitzgerald's co-pilot, Ramirez, testified that he saw Fitzgerald "inputting information" into the aircraft's "flight management system," which Ramirez said "is basically the navigation brain of the aircraft.  Anything you input in there the aircraft will follow."

This testimony alone points up the unworkability of Fitzgerald's engines-on, passengers-aboard, actually-moving approach; none of these conditions were met, and yet Fitzgerald was controlling the airplane's "navigation brain."  It also undercuts the dissent's similar requirements.  Even accepting the dissent's premise that to operate an "air common carrier" is to "control its transport of public passengers or freight," it is apparent from Ramirez's "navigation brain" testimony alone that passengers need not be on board nor the plane actually moving for a pilot to exercise control over the flight.  And, lastly, the evidence at trial puts the lie to Fitzgerald's computer and bicycle analogies.  The repair work described in the examples is far different from the preparatory steps Fitzgerald took in the cockpit.  In the analogies, nothing done dictates how a person will use the computer—what applications will be accessed, or to what end the computer's processing power will be put—or how a person will move the bicycle—going a certain speed, or traveling in a particular direction.  In Fitzgerald's case, by contrast, the actions he took—including programming the airplane's "navigation brain"—may well have controlled the airplane's movement once in flight.

The district court's explanation for its instructions also bolsters the point that what it means to "operate" a common carrier will vary quite a lot among the vehicles that comprise the class of common carriers.  The act of operating an airplane is far more complex than driving a bus, and certain pre-movement activities might be especially critical for the former.  A pilot's intoxication while preparing for take-off—especially when he is completing tasks without a co-pilot's supervision, as Fitzgerald's co-pilot said was their custom—might prove more dangerous than a pilot's intoxication during flight itself, for at least two reasons.  The first is that commercial air travel, unlike road travel, is almost always done by at least two pilots.  Had Fitzgerald actually taken flight on the Talon Air jet that morning, Ramirez could have taken the reins.  The second is that air travel, again unlike road travel, is not so reliant on the split-second,

start-stop reflexes that are often called upon while driving in traffic. A plane should never find itself passing another plane head-on in close proximity or forced to hit the brakes because of a sudden slow-down. This is not to say a pilot's job is an easy one, but only that intoxication in the lead-up to take-off may well dictate the plane's safe and effective movement more than anything that happens up in the air.

Contextual considerations—with due attention paid to the intricacies of operating an aircraft specifically and not just a "common carrier" generally—thus establish the integrity of the district court's interpretation of "operate." And even assuming the term remained ambiguous, the statute's public-safety purpose further confirms the district court's reading.

*Statutory Purpose.* Where Congress's objective is clear, we consider whether that "purpose is better served by construing" a statute one way or the other. *See Holloway v. United States*, 526 U.S. 1, 9 (1999); *see also* Scalia & Garner, *Reading Law* 56 ("[T]he resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose."). The parties disagree about how to best define § 342's purpose. Fitzgerald frames it in a more limited fashion. He says the purpose of § 342 is to protect passengers from harm during movement. The government offers a broader purpose. It says the statute is meant to protect people from harm while a common carrier is moving, like Fitzgerald says, but also while it is being prepared to move. This disagreement creates the misimpression that neither party's interpretation of "operates" works under both conceptions of § 342's purpose. This just isn't so.

Even accepting that Fitzgerald is right about the purpose of § 342—that it is only meant to protect passengers during movement—it does not follow that actions taken in *preparation* for movement should fall outside § 342's reach. That rule would frustrate, not effectuate, § 342's purpose. Suppose this case presented far more tragic facts: that after Fitzgerald was removed from the flight, Ramirez neglected to re-program the flight-management system, and that shortly after take-off, the path charted by Fitzgerald's handiwork caused the Talon Air jet to collide with another plane. In this scenario, the calamity occurred while the plane was moving, but the root cause of it was Fitzgerald's error during preparation. Yet on Fitzgerald's view of § 342, he would evade prosecution. No matter how integral the steps he took were to the plane's actual

movement, if those steps were done before movement commenced, Fitzgerald says § 342 ought not bear on his behavior. That construction of the statute would frustrate Fitzgerald's own conception of § 342's purpose to protect passengers on common carriers during movement.

It may go too far to say § 342 would be rendered an absurdity if it did not cover preflight conduct, since the statute would, after all, still reach certifiably drunk pilots in midair. Even so, "absurd results are to be avoided," *United States v. Turkette*, 452 U.S. 576, 580 (1981), and courts should not construe a statute to "produce an absurd result that we are confident Congress did not intend," *United States v. Underhill*, 813 F.2d 105, 112 (6th Cir. 1987). But if we drew the "operates" line at engine-firing or wheels-turning, peculiar results could follow. One is highlighted vividly (if sensationally) by the government: "the drunk pilot would have to be traveling down the runway, with human lives strapped into a twenty-ton hunk of metal and fuel, hurtling toward 35,000 feet at 500 miles per hour, before federal law would prohibit his conduct." The example illustrates how anomalous it would be to treat an airplane and a bus the same for operating-while-intoxicated purposes. Airplanes cannot be pulled over. And a pilot who realizes he's had one too many drinks cannot slide into a rest stop and sleep it off. Once the flight has begun, all those mitigating options have vanished. The passengers and the public are at the pilot's mercy—dulled senses, impaired judgment, and all. If a pilot cannot violate § 342 by his preflight conduct, or can do so only when it may be too late to stop him, Congress's desire to protect passengers on common carriers would be undermined. While the statute would not be rendered toothless, it would lose its most meaningful bite.[6]

Some 200 years ago, the Supreme Court refused a similar invitation to defang federal law. In *The Emily & the Caroline*, the Court considered a provision in The Slave Trade Act of 1794 that made it illegal to "prepare [] any ship or vessel . . . for the purpose of carrying on any trade or traffic in slaves"; any ship so prepared was subject to forfeiture. 22 U.S. (9 Wheat) 381 (1824). The critical question was whether "prepare" meant to *begin* preparation or to *complete* it. The shipowners argued the latter and insisted their actions were a "mere inceptive fitting out,

---

[6]To be sure, the statute could still be enforced against pilots, but seemingly only once a pilot has completed a flight—and hence only after the danger the statute guards against has come to pass. *See United States v. Cope*, 676 F.3d 1219 (10th Cir. 2012) (prosecuting pilot under § 342, but only after he had completed a flight).

or an attempt to fit out" and thus "did not constitute the offence created by the acts of Congress." *Id.* at 383.   The Court would have none of it.   Because such an interpretation would make enforcement nearly impossible—the ship could simply set sail, thereby evading capture—the Court settled on a more flexible standard:

> As soon . . . as the preparations have progressed, so far as clearly and satisfactorily to show the purpose for which they are made, the right of seizure attaches.  To apply the construction contended for on the part of the claimant, that the fitting or preparation must be complete, and the vessel ready for sea, before she can be seized, would be rendering the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner.

*Id.* at 389.  As with the Emily and Caroline ships, so too with airplanes.  If "operate" started with movement, "evasion of the law"—at least until the danger it sought to prevent had already materialized—would be "rendered almost certain." *See id.* at 390.  Accordingly, not only is the district court's interpretation tenable as a textual matter, it is also superior to Fitzgerald's as a practical one: it would further § 342's public-safety purpose, not frustrate it.

Lastly, a few words on the rule of lenity, to which, had we discovered ambiguity in the term "operate," we could turn to break an interpretive-grid lock in Fitzgerald's favor. *See United States v. Bass*, 404 U.S. 336, 347 (1971).  Fitzgerald summons the rule here, but it is inapt for two reasons.  First, we only invoke the rule when the usual tools of statutory construction leave us with a "grievous ambiguity," not when, as here, they resolve the interpretive question. *Chapman v. United States*, 500 U.S. 453, 463 (1991) (citation omitted).  But even if such ambiguity remained, the rule is a poor fit for this case.  Lenity is premised in large measure on fair-notice principles—the idea that citizens must be given fair warning that certain conduct might subject them to criminal sanction. *See McBoyle v. United States*, 283 U.S. 25, 27 (1931) (refusing to expand a criminal statute's reach without "a fair warning . . . given to the world in language the common world will understand"); *United States v. Lanier*, 520 U.S. 259, 266 (1997) (describing lenity "as a sort of junior version of the vagueness doctrine" that "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered" (citation and quotation marks omitted)).  This court has embraced the same understanding of lenity. *See United States v. Canelas–Amador*, 837 F.3d 668, 674 (6th Cir. 2016) (invoking lenity where law did not provide a "minimum level of clarity and transparency"

and thus "fail[ed] to provide fair notice"). Fitzgerald, however, did not lack fair notice that he was acting illegally. Every American from their teenage years onward understands the delinquency inherent in drunk driving. Perhaps no one appreciates this reality more than a commercial airplane pilot with passengers in his care. It is thus little wonder why Fitzgerald repeatedly denied having had anything to drink; he knew answering otherwise would keep him from the cockpit. Nor is it surprising that Fitzgerald begged his arresting officer's mercy and told him that "this is going to ruin my life." In short, even if the appropriate meaning of "operate" remained ambiguous, we would hesitate to invoke the rule of lenity to resolve it.

\*          \*          \*

While this case presents an interesting question of statutory interpretation, it is only because, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (addressing vagueness argument). No definition of "operate" could account seamlessly for the facts presented by cases, like this one, at the margin. What is clear, however, is that the rules proposed by Fitzgerald and the dissent—that passengers must be aboard, the engines must be on, and the plane must be moving—are neither textually mandated nor practically sensible. The district court's interpretation of "operate," by contrast, was suitably tailored to the particular facts of this case and provided the jury with ample and accurate guidance for its deliberations. We therefore reject Fitzgerald's interpretive challenge.

### III

Given the district court's interpretation of "operate," did the government produce enough evidence to sustain the jury's verdict against Fitzgerald? Clearly, yes.

This court "will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015). In determining whether "substantial and competent evidence" supported the judgment, this court must draw all reasonable inferences from the record in favor of the prosecution and must avoid the temptation to weigh the evidence anew or assess the credibility of witnesses. *Id.* After doing so, if "*any* rational [juror] could

have found the essential elements of the crime beyond a reasonable doubt," the judgment must be affirmed. *Id.*

The analysis above respecting the meaning of "operate" largely resolves Fitzgerald's sufficiency challenge. The evidence presented at trial, taken in the light most favorable to the prosecution, showed that Fitzgerald manipulated several of the airplane's controls for nearly an hour, turning on the auxiliary power unit, calibrating the altitude-measuring device, programming the flight-management system, and communicating with air-traffic control. Any one of these actions alone might have provided sufficient evidence of operation. Taken together, it is not close: a rational trier of fact could have found beyond a reasonable doubt that Fitzgerald operated the aircraft, since he performed many "actual operational or functional requirements for the flight, and not simply some administrative or clerical task." Sufficient evidence therefore supported Fitzgerald's conviction.

**IV**

Fitzgerald next argues that the district court's definition of "operate" led it to commit a second reversible error: providing erroneous jury instructions. We review a district court's instructions, including any responses to jury questions, for an abuse of discretion. *United States v. Fisher*, 648 F.3d 442, 446-47 (6th Cir. 2011). This means we will not quibble with the court's instructions unless they were, as a whole, "confusing, misleading, and prejudicial." *United States v. Young*, 553 F.3d 1035, 1050 (6th Cir. 2009) (citation and quotation marks omitted).

As with Fitzgerald's sufficiency-of-the-evidence challenge, the fact that we have ruled against him on the meaning of "operate" all but dooms his cause on the instructions issue. Fitzgerald's primary argument is the same one we have already rejected—that the "directly and proximately linked to actual operational or functional requirements for the flight" goes beyond the proper meaning of "operate" because it "goes well beyond control of movement."

But one wrinkle in Fitzgerald's jury-instructions argument warrants further discussion. Fitzgerald says the court's instruction and its answer to a later jury question on the instruction— in light of the testimony at trial—in effect directed a verdict against him. His argument runs likes this: the government's aviation expert testified that any step listed in the airplane's

instruction manual was an operational or functional requirement for flight; evidence at trial showed Fitzgerald completed some of the steps in the instruction manual; and since the district court's instruction said that completing any operational or functional requirement for the flight constituted operation of the aircraft, the jury had no choice but to convict. As Fitzgerald puts it, "a reasonable juror would have understood the court's instruction to define 'operates' as akin to 'undertakes any step listed in the aircraft's instruction manual.'"

We disagree. Neither the district court's instruction, nor its later response to the jury's question, told the jury what counts as an operational or functional requirement for the flight. True, the government's witness testified that he would consider certain items in the manual's preflight checklist to constitute operational or functional requirements, but never—not in the instructions themselves, and not in any answer to jury questions—did the district court instruct the jury that it must accept that testimony. The jury asked the court to clarify whether "actual operational or functional requirements for the flight" meant "flight of [the] plane physically or does it mean 'legally' as per operation manual?" The court responded that the "operation manual . . . may have some help for you on what you think fits within those requirements," but cautioned the jury that the manual will not "give you the magic answer" and that this was not "a needle-in-a-haystack operation."[7] Rather, as with any piece of evidence, the district court said the manual is but one part of an "amalgamation"; it remained the jury's job to decide how to treat the manual and the government witness's testimony, and how to weigh all the evidence together in deciding whether Fitzgerald's actions qualified as operational or functional requirements for the flight.

Far from directing a verdict against Fitzgerald, the district court's instruction and its answer to the jury's question fairly captured what it means to operate an airplane, and allowed the jury to decide whether the evidence showed Fitzgerald had done so. This was no abuse of discretion.

---

[7]Though Fitzgerald's argument about the court's answer to the jury's question fails on its own merits, it may also have been waived; Fitzgerald's attorney "basically, d[id not] object" to the court's answer to the jury's question.

**V**

Fitzgerald's last challenge is to his sentence. Fitzgerald moved for a downward departure under United States Sentencing Guidelines § 2D2.3, the commentary to which provides: "If no or only a few passengers were placed at risk, a downward departure may be warranted." The district court declined. Ordinarily, we do not review a district court's denial of a downward departure, *United States v. Gale*, 468 F.3d 929, 937 (6th Cir. 2006), but that changes when "the record reflects that the district court was not aware of or did not understand its discretion to make such a departure." *United States v. Theunick*, 651 F.3d 578, 592 (6th Cir. 2011) (citation and quotation marks omitted). In such a situation, this court may order a remand for the district court to consider, with a proper view of its own authority, whether a downward departure is warranted. Fitzgerald says that situation obtains here.

He is wrong. The district court expressly recognized the authority vested in it by virtue of the commentary following § 2D2.3. Referring to the application note, the district court said: "It's a guidance. It's a permissive statement. And it's one that I don't think on the facts of this case actually warrant or trigger a departure." The district court correctly conceptualized § 2D2.3 as imbuing it with discretion, not mandating any particular departure—an understanding consistent with the commentary's language, which says only that a "downward departure *may* be warranted." § 2D2.3 (emphasis added). So the district court quite clearly understood it *could* depart downward. It just chose not to do so.

All the same, Fitzgerald says there is another problem: maybe the district court understood it had discretion generally to depart downward, but it misunderstood the considerations that should inform the exercise of that discretion. Specifically, Fitzgerald argues that the district court declined to depart by focusing on the harm Fitzgerald's actions posed to *any* person, rather than specifically on passengers, with which § 2D2.3 is concerned. To convince us, Fitzgerald cherry-picks quotations from the sentencing hearing where the district court discussed the "real physical risk to people on the ground because of Mr. Fitzgerald's condition," rather than the number of passengers Fitzgerald had imperiled. Yet as the government notes, the district court also explained its refusal to depart downward by stating this was *not* a case where "no or only a few passengers were placed at risk." § 2D2.3. Instead, the

district court noted that this was a "regularly scheduled commercial flight" with "passengers that were scheduled to depart, should have departed, and but for the intervention of the captain and ground crew and other people at the airport would have departed with a drunk pilot." True, the flight was a smaller charter flight—three passengers would be on board—but it is for the district court, not us, to decide what counts as a sufficiently minor risk to warrant a downward departure. Fitzgerald's sentencing challenge therefore fails.

**VI**

The judgment of the district court is **AFFIRMED**.

———————————

**DISSENT**

———————————

GRIFFIN, Circuit Judge, dissenting.

In my view, Fitzgerald's preparatory actions amounted to merely an attempt to operate the air common carrier. Because Congress failed to include an attempt provision in 18 U.S.C. § 342, I would hold that as a matter of law Fitzgerald did not "operate" the air common carrier. I therefore respectfully dissent.

I.

"Operate" is a vague word with myriad meanings. *See*, *e.g.*, *Oxford English Dictionary* 848 (2d ed. 1989) (outlining eight definitions for "operate"); *Random House Dictionary of the English Language* 1357 (2d ed. 1987) (twelve definitions); *American Heritage Dictionary of the English Language* 1268 (3d ed. 1992) (seven definitions). Congress chose not to tell us what the word means in § 342, so we must give it the ordinary meaning it had when Congress enacted the statute. *See United States v. Santos*, 553 US 507, 511 (2008) (plurality op.); *United States v. Miller*, 734 F.3d 530, 540 (6th Cir. 2013); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 78 (2012) (discussing the fixed-meaning canon of statutory construction, which provides that words must be given the meaning they had when the statute was enacted).

Context lets us home in on which of the many ordinary meanings of "operate" Congress must have meant. Section 342 uses "operate" in the transitive sense and makes "common carrier" the direct object. Thus, the ordinary meaning we seek must be transitive and must take a direct object similar to a common carrier. The majority identifies four possible ordinary meanings, each of which uses the term in the transitive sense and takes a direct object similar to a common carrier. Although the majority never tells us why it ultimately chooses the American Heritage's definition, I have no qualms with the choice because that definition is the most descriptive of the group. I therefore agree that the ordinary meaning of "operate" is "to control the functioning of." *American Heritage Dictionary of the English Language* 1268 (3d ed. 1992).

I also agree that the definition fails to provide "obvious limiting principles" that resolve this appeal. And I agree that without such principles we must look to context.

But that is where my agreement ends. The majority accepts Fitzgerald's contention that context requires us to define "operate" by reference to movement because § 342 extends only to the operation of common carriers, which transport public passengers or freight from place to place. Then my colleagues go a step further: they subdivide common carriers into various vehicle types. Yet what at first glance seems "natural and sensible," is in fact my colleagues' most critical mistake. Yes, Congress also subdivided common carriers into vehicle types, but not the same vehicle types the majority lists. As relevant here, Congress defined "common carrier" to include an "air common carrier," 18 U.S.C. § 341, but my colleagues mention only an "airplane."

This distinction matters. Just as a square is always a rectangle but a rectangle is not always a square, an air common carrier is always an airplane but an airplane is not always an air common carrier. "A statute that uses a common-law term, without defining it, adopts its common-law meaning." *Reading Law* at 320 (discussing the Canon of Imputed Common-Law Meaning). Here, although Congress has defined "common carrier," the definition is self-referential: a "common carrier" includes an "air common carrier." 18 U.S.C. § 341. In other words, by using a common-law term to define itself, Congress hasn't actually defined the term. So we must give the term its common-law meaning. We find that meaning in *Black's Law Dictionary*, which defines "common carrier" as "[a]ny carrier required by law to convey passengers or freight without refusal if the approved fare or charge is paid[.]" *Black's Law Dictionary* 275 (6th ed. 1990); *Black's Law Dictionary* 249 (5th ed. 1979) (same).

Thus, an airplane may or may not be an air common carrier at any given time; whether it is depends on its ownership and use. If, for example, an airline crew flies an empty airplane from one airport to another, the airplane is not an air common carrier because it is not transporting public passengers or freight. The same is true if the airplane carries only airline employees traveling on the clock because they are needed in another city. Put simply, for an airplane to be an air common carrier, it must transport public passengers or freight. This means that an air common carrier *functions* not simply by flying or moving, but by transporting such

passengers or freight.  To "operate" an air common carrier by "control[ling] its functioning," then, one must control its transport of public passengers or freight.

This Fitzgerald did not do.  During his time in the cockpit, passengers never boarded and the aircraft never moved.  Although he took preparatory actions, he never controlled the air common carrier's transport of passengers because there were never any passengers and there was never any transport.  That means that as a matter of law Fitzgerald did not "operate" the air common carrier.

What he did do was attempt to operate it.  An attempt crime requires proof that a defendant:  (1) intended to commit the proscribed criminal conduct and (2) took a "substantial step" towards completing that conduct.  *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–08 (2007).  Here, by every indication, Fitzgerald intended to control the aircraft's transport of passengers; he repeatedly insisted he was fit to fly and began to prepare the aircraft for its journey.  And each action he took—calibrating the altimeter, programming the flight-management system, starting the auxiliary-power unit—was undoubtedly a substantial step toward operating the aircraft; as the majority notes, these steps were necessary for takeoff.  These actions, however, amounted to only thirty percent of the pre-flight preparations necessary for takeoff; it would have taken approximately forty-five more minutes of preparation before the aircraft could have departed.

Congress could have included an attempt provision in the statutory framework but did not.  When Congress wants to criminalize the attempt to commit a crime, "it knows exactly how to do so," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018), and *has* done so time and again with other crimes.  *See*, *e.g.*, 18 U.S.C. § 1113 (making it a crime to attempt to commit murder within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 2251(e) (making it a crime to attempt to produce child pornography); 21 U.S.C. § 846 (making it a crime to attempt to commit drug offenses); 26 U.S.C. § 7201 (making it a crime to attempt to evade taxes).

Indeed, for years, Congress has had specific examples of how to create an attempt provision to punish pilots who do as Fitzgerald did.  The Federal Aviation Administration's

regulations provide that "[n]o person may act or *attempt to act* as a crewmember of a civil aircraft" (1) within eight hours of consuming an alcoholic beverage; (2) while under the influence of alcohol; (3) while using any drug that impairs one's faculties; or (4) with a blood-alcohol content above 0.04%.  14 C.F.R. § 91.17(a) (emphasis added).  Similarly, the State of Michigan has made it a crime to "operate an aircraft or act or *attempt to act* as a crew member of an aircraft over or upon the lands or waters of [the] state" with a blood-alcohol content above 0.02%.  Mich. Comp. Laws § 259.185(2) (emphasis added).  Here, state prosecutors even charged Fitzgerald with violating § 259.185(2)—alleging that he "did *attempt to act* as a crew member of the aircraft"—before federal prosecutors took over the case (which led to the dismissal of the state charge without prejudice).  (Emphasis added).

## II.

Instead of noting § 342's lack of an attempt provision and pointing it out to Congress, my colleagues go outside our purview as judges and rewrite the law to implement their own policy preference—one that favors punishing not only intoxicated pilots who endanger passengers but also those who almost endanger them.  The result is an expansion of § 342 to include an attempt provision that isn't there.

## A.

The majority first invokes the Supremacy-of-Text Principle, *Reading Law* at 56–58, by noting that we consider which permissible interpretations "would serve, rather than frustrate, the statute's manifest purpose."  Rather than looking to § 342's text to determine whether the statute has a manifest purpose and, if so, what that purpose is, the majority simply assumes that Fitzgerald's proposed purpose—the protection of passengers during movement—is the statute's manifest purpose.

Doing so violates three of the four limitations on this principle, none of which my colleagues mention.  "First, the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."  *Id*. at 56.  "Second, the purpose must be defined . . . not in a fashion that smuggles in the answer to the question before the decision-maker."  *Id*.  To find a specific purpose "in the absence of a clear

indication in the text is to provide the judge's answer rather than the text's answer to the question." *Id.* at 57. And third, purpose cannot be used to supplement a statute's text. *Id.* "[T]he limitations of a text—what a text chooses *not* to do—are as much a part of its 'purpose' as its affirmative dispositions." *Id.*

Here, when identifying § 342's purpose, the majority looks no further than Fitzgerald's brief; my colleagues never consult the statute's text. Examination of the text reveals several potential purposes, but no *manifest* one. Section 342 was a small piece of the sweeping Anti-Drug Abuse Act of 1986, the preamble of which lists purposes of "eradicating illicit drug crops," "halting international drug traffic," "improv[ing] enforcement of Federal drug laws," establishing drug abuse prevention and treatment programs, and "other purposes." See Pub. L. No. 99-570, 100 Stat. 3207. None of the enumerated purposes fits § 342's content, so its purpose must be one of the "other purposes."

To be sure, the protection of passengers by deterring the drunken preparation of common carriers is one potential purpose. But it is not alone. Another equally possible and plausible purpose is a punitive one: punishing those who endanger public passengers by drunkenly controlling the transport of such passengers. Congress might well have seen a difference in harm—and thus imposed a difference in punishment—between the drunken preparation of common carriers and the drunken control of their movement. After all, as happened here, it is possible to correct dangerous mistakes made prior to movement and thus to take passengers out of harm's way; co-workers, security personnel, local law enforcement, and others can step in. Once a common carrier is loaded and in transit, however, intervention becomes much more difficult. Perhaps Congress meant to reserve federal prosecution and the consequences that come with it for only those pilots who actually endanger public passengers by drunkenly controlling an air common carrier's movement—a scenario in which the risk of harm has gone from potential to actual.

My point is not that this punitive purpose was in fact what motivated Congress, but simply that § 342's text leaves us unable to identify a manifest purpose, much less one we can treat as the statute's sole purpose and use to dismiss Fitzgerald's proposed interpretation. We are

judges, not legislators, and what my colleagues call "unworkab[le]", I call a policy choice well within Congress's discretion.

## B.

The majority also invokes the Presumption Against Ineffectiveness, which "ensures that a text's manifest purpose is furthered, not hindered." *Reading Law* at 63. Although the majority cites *The Emily & the Caroline*, 22 U.S. (9 Wheat) 381 (1824) to support its analysis, the case demonstrates exactly why the presumption has no application here. As *Reading Law* discusses:

> The Slave Trade Act of 1794 [1 Stat. 347, § 1] forbade anyone to "build, fit, equip, load, or otherwise prepare, any ship of vessel, within any port or place of the said United States . . . for the purpose of carrying on any trade or traffic in slaves"—or else the ship or vessel would be forfeited. The crucial word was *prepare*: Did it mean to begin preparations, or to complete them? The evidence indisputably showed that the ships would be used to transport slaves, but the shipowners argued that the ships could not be "prepared" if they were not yet ready for use toward that purpose. The Supreme Court of the United States held that this interpretation would render "evasion under the law . . . almost certain":
>
> > As soon . . . as the preparations have progressed, so far as clearly and satisfactorily to show the purpose for which they are made, the right of seizure attaches. To apply the construction contended for on the part of the claimant, that the fitting or preparation must be complete, and the vessel ready for sea, before she can be seized, would be rendering the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner. [*The Emily & the Caroline*, 22 U.S. at 389.]
>
> In other words, the vessel would never be fully "prepared" until it set sail, and would therefore be much harder to seize.

*Reading Law* at 63–64. What is important is that the Slave Trade Act of 1794 had a manifest purpose: to prevent domestic ships and vessels from trafficking slaves. This we can glean from the penalty for violating the prohibition; forfeiture rather than imprisonment demonstrates Congress's desire to prevent future violations rather than to punish for past ones. In other words, the Principle Against Ineffectiveness applied in *The Emily & the Caroline* because the statute at issue had only one purpose—a purpose that one interpretation furthered and the other hindered.

The same cannot be said for § 342. As discussed above, § 342's text leaves us unable to identify a manifest purpose. This, alone, means the Presumption Against Ineffectiveness has no

application here. And even if we could say that the statute's manifest purpose was to protect passengers, it would not follow that a narrow interpretation would remove § 342's "most meaningful bite." This logic "smuggle[s] in the answer to the question" by "assuming what is to be proved," *Reading Law* at 56–57: that § 342 had such a bite to begin with. It also treats § 342 as the only safeguard to the drunken preparation of an air common carrier when the statute is neither unique nor what prevented the risk of harm to passengers in this case. Authorities arrested Fitzgerald on a state charge; it wasn't until later that the United States indicted him under § 342.

My colleagues further reason that, "as with the Emily and Caroline ships," "[i]f 'operate' started with movement, 'evasion of the law'—at least until the danger [§ 342] sought to prevent had already materialized—would be 'rendered almost certain.'" The comparison is inapt. When Congress passed the Slave Trade Act of 1794, evasion of the law via ship or vessel was easy because our nation was in its infancy—we didn't even have a Navy. *See* the Naval Act of 1794, 1 Stat. 350 (passed five days after the Slave Trade Act of 1794's passage). In modern times, we seem to track everything—every flight, every voyage, every bus route—simply as a matter of course. Long gone are the days when a commercial vehicle can travel into the horizon unnoticed. Regardless, my colleagues' reasoning again incorrectly assumes that § 342's manifest purpose is to protect passengers from the dangers that arise when someone drunkenly prepares a common carrier—something the text just doesn't tell us.

## C.

The majority invokes the Absurdity Doctrine as well, which allows us to disregard or correct a provision—if the correction is textually simple—when we find an error that, if ignored, "would result in a disposition that no reasonable person could approve." *Reading Law* at 234. The doctrine has two limits: (1) "[t]he absurdity must consist of a disposition that no reasonable person could intend" and (2) "[t]he absurdity must be reparable by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error." *Id*. at 237–38.

"The doctrine does not include substantive errors arising from a drafter's failure to appreciate the effect of certain provisions," *id*. at 238, and one example of the doctrine's application is enough to show why it plays no role in this case. The Arkansas legislature once passed a law stating in relevant part: "All laws . . . are hereby repealed." Act 17 of 1945 (repl. 1980). As the Arkansas Supreme Court later noted, the act had not in fact repealed every law in the State: "No doubt the legislature meant to repeal all laws in conflict with that act, and, by error of the author or the typist, left out the usual words 'in conflict herewith,' which we will [infer] by necessary construction." *Cernauskas v. Fletcher*, 201 S.W.2d 999, 1000 (Ark. 1947); *see also Reading Law* at 236–37 (discussing the case as an example of when the Absurdity Doctrine properly applies).

Here, the majority outlines not an absurdity leading to a result that no reasonable person could intend, but an alleged substantive error arising from the drafter's failure to account for the dangers one can create by drunkenly preparing a common carrier for movement.

## D.

Finally, there is the rule of lenity. To be sure, I view § 342's text, read within the statute's context, as leaving no doubt in this case. So do my colleagues, but they see no doubt as to Fitzgerald's guilt rather than his innocence. Nevertheless, the rule of lenity is further support for adopting a narrow reading of "operate" and is yet another legal concept my colleagues misapply.

The majority tells us that we only use the rule "when the usual tools of statutory construction leave us with a 'grievous ambiguity.'" (Citing *Chapman v. United States*, 500 U.S. 453, 463 (1991)). Although that is one formulation of when to apply the rule, it is not the only one. The Supreme Court has given us at least five formulations for determining when the rule of lenity applies:

- "[O]nly when the equipoise of competing reasons cannot otherwise be resolved." *Johnson v. United States*, 529 U.S. 694, 713 n.13 (2000).

- When the court "can make no more than a guess." *Reno v. Koray*, 515 U.S. 50, 65 (1995) (internal quotation marks omitted).

- When the court is "left with an ambiguous statute." *Smith v. United States*, 508 U.S. 223, 239 (1993) (citation omitted).

- When the court is left with "grievous ambiguity or uncertainty." *Muscarello v. United States*, 524 U.S. 125, 139 (1998) (citation omitted).

- When, after all the legitimate tools of interpretation have been applied, "a reasonable doubt persists." *Moskal v. United States*, 498 U.S. 103, 108 (1990).

Our Circuit has also given varying formulations for when to apply the rule:

- "[A]s a tiebreaker of last resort[.]" *United States v. Morales*, 687 F.3d 697, 701 (6th Cir. 2012) (internal quotations omitted).

- "[W]hen the plain language, structure, and legislative history provide no guidance[.]" *United States v. King*, 516 F.3d 425, 432 (6th Cir. 2008).

- "When there are two rational readings of a criminal statute" and Congress hasn't spoken in "clear and definite language." *United States v. Brock*, 501 F.3d 762, 768 (6th Cir. 2007) (citations omitted), *abrogated on other grounds, Ocasio v. United States*, 136 S. Ct. 1423, 1428–29 (2016).

- "[W]here significant doubt or uncertainty lingers." *United States v. Canelas-Amador*, 837 F. 3d 668, 675 (6th Cir. 2016).

Of these different standards, I would apply the *Moskal* formulation—one penned by Justice Thurgood Marshall and endorsed by Justice Scalia. *See Reading Law* at 299. Under this formulation, the rule of lenity would militate against adopting a broad reading of "operate" because reasonable doubts abound. After applying all the legitimate tools of interpretation, we are left with a vague, undefined word; no clear, manifest statutory purpose; and a self-referential definition. "[W]hen the government means to punish, its commands must be reasonably clear. When they are not clear, the consequences should be visited on the party more able to avoid and correct the effects of shoddy legislative drafting—namely, the federal Department of Justice or its state equivalent." *Id*.

But regardless of which formulation we apply, one thing is certain: the majority's view of the rule of lenity is that there is no rule of lenity. If Fitzgerald had "fair notice that he was acting illegally," my colleagues reason, the rule of lenity is a "poor fit" for this case. And "[e]very American from their teenage years onward understands the delinquency inherent in drunk driving," they continue, so Fitzgerald had proper notice. The major premise in this

syllogism is lacking, and the minor premise simply does not lead to the conclusion the majority draws. For the rule of lenity to be rendered inapplicable, Fitzgerald needed more than notice that his conduct was delinquent, generally; he needed notice that he was acting in violation of § 342, specifically. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) (noting that the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered"); *Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). Yet under the majority's conception of the rule of lenity, anytime some law, somewhere, prohibits an act, a person who so acts can be convicted of violating any law, anywhere, that prohibits it—even if the prohibition is unclear. If that is so, the rule of lenity is no more.

### III.

The majority makes a strong case for amending § 342 to add further protection for passengers or freight by deterring the intoxicated preparation of common carriers. But that amendment should come from Congress, not from us judges. I would hold that Fitzgerald attempted to "operate" a common carrier but did not do so because he did not complete the proscribed offense. For this reason, I would vacate Fitzgerald's conviction and remand for the entry of a judgment of acquittal.